

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00332-CR

———————————————

JOSE GUZMAN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 213th District Court
Tarrant County, Texas
Trial Court No. 1546912R

---

Before Pittman, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

A jury found Appellant Jose Guzman guilty of aggravated assault with a deadly weapon, and the trial court sentenced him to fifteen years' imprisonment. *See* Tex. Penal Code Ann. § 22.02(a)(2). In a single point, Guzman argues that the admission of a recording of a 911 call violated his right to confrontation. Because we hold that the statements in the 911 call were not testimonial, and thus the Confrontation Clause does not apply, we affirm.[1]

## II. The Statements in the 911 Call Were Nontestimonial

In his sole point, Guzman argues that the trial court abused its discretion by admitting a recording of a 911 call that allegedly violated his Confrontation Clause rights.

## A. Standard of Review

A trial court's decision to admit evidence is reviewed under an abuse-of-discretion standard. *Wall v. State*, 184 S.W.3d 730, 743 (Tex. Crim. App. 2006). However, if the admission of evidence involves a constitutional legal ruling, such as whether a statement is testimonial or nontestimonial, the appellate court gives almost total deference to the trial court's determination of historical facts but reviews de novo the trial court's application of the law to those facts. *See Langham v. State*, 305

---

[1]Because Guzman does not challenge the sufficiency of the evidence to support his conviction, we omit a factual background.

S.W.3d 568, 576 (Tex. Crim. App. 2010); *Wall*, 184 S.W.3d at 742 (applying hybrid standard of review to issue of whether statement was testimonial).

## B. Applicable Law

The Confrontation Clause of the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 38, 124 S. Ct. 1354, 1357 (2004); *Langham*, 305 S.W.3d at 575 (citing U.S. Const. amend. VI). "[T]he most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 562 U.S. 344, 358, 131 S. Ct. 1143, 1155 (2011). Once a defendant raises a Confrontation Clause objection, the burden shifts to the State to prove either (1) that the proposed statement does not contain testimonial hearsay and thus does not implicate the Confrontation Clause or (2) that the statement does contain testimonial hearsay but is nevertheless admissible. *See De la Paz v. State*, 273 S.W.3d 671, 680–81 (Tex. Crim. App. 2008) (citing *Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374).

To determine whether the admission of the recording of the 911 call violated the Confrontation Clause, we must first determine whether the statements on the

recording are testimonial. In *Davis v. Washington*, the United States Supreme Court explained the distinction between testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency[] and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. 813, 822, 126 S. Ct. 2266, 2273–74 (2006) (footnote omitted).

"Statements made to police during contact initiated by a witness at the beginning of an investigation are generally not considered testimonial." *Cook v. State*, 199 S.W.3d 495, 498 (Tex. App.—Houston [1st Dist.] 2006, no pet.). For this reason, 911 calls initiated to summon police assistance are generally nontestimonial because they are "a cry for help" or "the provision of information enabling officers immediately to end a threatening situation." *Davis*, 547 U.S. at 832, 126 S. Ct. at 2279; *Cook*, 199 S.W.3d at 498; *see also Rodgers v. State*, No. 09-09-00359-CR, 2010 WL 3043705, at *2 (Tex. App.—Beaumont Aug. 4, 2010, no pet.) (mem. op., not designated for publication) (listing cases in which courts concluded similar 911 calls were nontestimonial).

In *Davis*, the Court addressed whether statements made by a victim of domestic violence to a 911 operator were testimonial in nature. *See* 547 U.S. at 826–27, 126 S. Ct. at 2276–77. In concluding that the caller's statements were nontestimonial and thus admissible, the *Davis* court considered the following factors: (1) the caller was

4

describing events as they were actually happening rather than past events; (2) any reasonable listener would recognize that the caller was facing an ongoing emergency; (3) when viewed objectively, the nature of what was asked and answered was such that the elicited statements were necessary to resolve the present emergency, rather than simply to learn what had happened in the past; and (4) the caller was frantically answering the 911 emergency operator's questions over the phone in an environment that was not tranquil or even safe. *See id.* at 826–27, 126 S. Ct. at 2276–77. The *Davis* court concluded that the caller was "seeking aid, not telling a story about the past." *See id.* at 831, 126 S. Ct. at 2279. With these considerations in mind, we now examine the statements contained in the 911 recording.

## C. The 911 Call

Here, the record reflects that a female initiated a call to 911 at 10:37 a.m. on May 14, 2017; the call lasted approximately seven minutes. The caller stated to the 911 dispatcher that she had just heard someone get shot and had seen a guy run out of a neighboring apartment with a gun. Initially, her voice was shaky, and she sounded out of breath; during most of the conversation, she breathed rapidly and heavily. The dispatcher asked for the location, and the caller provided the address and the name of the apartment complex. When the dispatcher asked for the apartment number corresponding to the guy with the gun, the caller said that she did not want to "go out there" to obtain the apartment number because she was scared. The dispatcher asked if she knew of any injuries, and she responded that she heard a

5

guy groaning in pain but that she was too scared to go out there "right now." She then said that the apartment in question was the second-floor apartment that was closest to the dumpster. She also stated that a bunch of people had gotten into three different cars and had driven off "really fast." The dispatcher asked where the cars went, and the caller said that she only got a glimpse of one of the cars (a silver SUV that was driving toward the Road to Six Flags Street) because she was lying flat on her patio. The caller described the guy who was carrying a gun: he was wearing a white tee shirt; looked "maybe Hispanic"; had his hair slicked back; and was pretty thin, was of normal height, and was "probably in his thirties." When the dispatcher asked how many people were involved, the caller said that "there was enough for three cars." The caller provided more identifying information about the location of the shooter's apartment but did not want to give her apartment number and asked to remain anonymous. The dispatcher asked what type of gun she had seen, and she said that it was a silver handgun with a big barrel. The dispatcher asked her how many shots she had heard, and she answered that she had heard only one shot. The caller then informed the dispatcher that she could see police lights. The dispatcher asked again how many people she thought were involved, and she said that she assumed there were probably six to ten based on the yelling and the noises that she had heard on the stairs but that she had not seen the people because she was afraid and was lying flat. She said that she knew that the person involved in the shooting had already driven away from the scene but that the person who was shot was probably still there. She

6

stated that she wanted to make sure that "help gets here and that the [victim] gets help."

## D. Analysis of the *Davis* Factors

With regard to the first *Davis* factor, Guzman argues that the 911 caller's statements were testimonial because "everything described by the caller was in the past tense." Although it is true that the caller was not describing events as they were actually happening, courts applying the *Davis* factors have held statements to be nontestimonial even though they were not describing events in progress. *See Hernandez v. State*, 562 S.W.3d 500, 506 (Tex. App.—Houston [1st Dist.] 2017, pet. filed) (collecting cases). The events described in the 911 call, while in the past, were in the immediate past, and the caller's statements describing the events were necessary for the police to form an idea about the type of emergency with which they were dealing. *See id.*

As to the second factor, Guzman argues that this case presents "objective non-emergency facts." Guzman contends that because he was gone by the time the 911 call was made, "not even [his] presence could count as an ongoing danger." Although the caller readily admitted that the shooter had left the scene, she had no assurance that the emergency was over as demonstrated by her shaky voice; her rapid, heavy breathing; her statements that she was scared to go "out there" to obtain the apartment number or to check on the victim; and her request for help for the victim.

7

Given these facts, a reasonable listener would recognize that the caller was facing an ongoing emergency. *See id.*

With regard to the third *Davis* factor, the nature of what was asked and answered during the call, when viewed objectively, was such that the elicited statements were necessary to effectively address the present emergency, rather than simply to learn what had happened in the past. After the caller stated that she had just heard someone get shot, the dispatcher obtained essential information regarding the location of the shooting. The dispatcher then asked questions regarding the status of the victim's injuries. The dispatcher also asked about the number of people involved in the shooting, their location, and the type of gun that she had seen. Guzman argues that the caller provided details that were not "immediately necessary" by describing the cars that had left the area, the direction the cars had gone, how many people she had seen, and the type of gun the shooter had been carrying.[2] But even those details were necessary to resolve the responding officers' need for information about "whom they [were] dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *See id.* (citing

---

[2]Guzman relies on *Gutierrez v. State*, 516 S.W.3d 593, 598–99 (Tex. App.— Houston [1st Dist.] 2017, pet. ref'd). In that case, the court held that the statements in the 911 call were testimonial because the statements were focused on the past without any expressed concern or discussion of an ongoing emergency; the caller spent time looking through photos on her phone to provide appellant's license plate number, which the 911 operator said was not needed; and the caller provided a written statement to the police. *Gutierrez* is thus distinguishable on its facts.

*Davis*, 547 U.S. at 832, 126 S. Ct. at 2279); *see also Colbert v. State*, No. 03-17-00558-CR, 2019 WL 1065889, at \*4 (Tex. App.—Austin Mar. 7, 2019, no pet. h.) (mem. op., not designated for publication) (concluding that the questions asked by the 911 operator and the answers given by the caller were of the kind necessary to supply responding officers with the information needed to locate the victims, possibly apprehend the assailants, and respond appropriately to the potential threat to safety); *Dixon v. State*, 244 S.W.3d 472, 484–85 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (concluding that the primary purpose of the 911 operator's questions "was to determine if [complainant] was physically injured," if she needed medical assistance, and if there was "the potential for a continuing threat to [her] safety or the safety of the responding officer").

As to the fourth factor, the recording demonstrates that the caller was scared; her voice was initially shaky and sounded as if she was out of breath, she then proceeded to breathe rapidly and heavily during the majority of the call, and she specifically stated that she was scared to go "out there." These facts indicate that the caller's statements to the 911 dispatcher were nontestimonial. *See Hernandez*, 562 S.W.3d at 507 (holding that the caller's statements to the 911 operator were nontestimonial because she was upset, her voice was shaking, and she was breathing heavily).

We conclude that the out-of-court statements on the 911 recording, when viewed objectively, were made informally under circumstances indicating that the

9

primary purpose of the interrogation was to enable the police to meet an ongoing emergency, rather than to establish or prove past events potentially relevant to later criminal prosecution. *See id.*; *see also Colbert*, 2019 WL 1065889, at *4–5 (concluding that the statements on the 911 recording were nontestimonial because "[t]he objective circumstances indicate[d] that the 911 call was made for the purpose of reporting a crime, namely the robbery incident and the flight of armed assailants, and to obtain police assistance"); *Rosenbusch v. State*, No. 03-18-00096-CR, 2018 WL 6837741, at *2 (Tex. App.—Austin Dec. 28, 2018, no pet.) (mem. op., not designated for publication) (holding that the statements in the 911 calls made by witnesses were nontestimonial because the calls were made primarily to seek emergency assistance where the assault had just taken place, the victim was injured, the callers did not know the whereabouts of the assailant, and the callers were either explicitly requesting law enforcement and medical personnel or were implying that they should quickly come to the scene); *Robles v. State*, No. 01-16-00199-CR, 2018 WL 1056482, at *5–6 (Tex. App.—Houston [1st Dist.] Feb. 27, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that the statements made during the third 911 call, which was initiated by the victim's son six minutes after the victim was hit and while she was in "real pain," were nontestimonial because the circumstances objectively indicated that the primary purpose of the operator's questions was to facilitate police or medical assistance to meet an ongoing emergency). Because the statements on the 911 recording are not testimonial, their admission did not violate Guzman's right to confront the witnesses

10

against him.  Accordingly, we hold that the trial court did not abuse its discretion by admitting the statements in the 911 recording over Guzman's Confrontation Clause objection.  *See Colbert*, 2019 WL 1065889, at \*5; *Rosenbusch*, 2018 WL 6837741, at \*2; *Hernandez*, 562 S.W.3d at 507.  We overrule Guzman's sole point.

## III.  Conclusion

Having overruled Guzman's sole point, we affirm the trial court's judgment.


/s/ Dabney Bassel
Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  May 23, 2019

11